IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VANCE HERNANDEZ-SMITH,

                   Plaintiff,

     v.

CINDY O'DONNELL, CHRIS BUESGEN,
MARIO CANZIANI, JAMISON KUBALA,
and JONATHAN WILLIAMS,

                Defendants.[1]

OPINION and ORDER

20-cv-1117-jdp

---

       Plaintiff Vance Hernandez-Smith, appearing pro se, is currently a prisoner at Oshkosh Correctional Institution. Hernandez-Smith is a member of a group called the Nation of Gods and Earths (NGE), also known as the Five Percent Nation or the Five Percenters. Hernandez-Smith considers the NGE to be his religion; the Wisconsin Department of Corrections considers the NGE to be a "security threat group," DOC's term for a gang. While Hernandez-Smith was incarcerated at Stanley Correctional Institution, prison officials intercepted NGE materials that he had tried to obtain from another court and punished him. Hernandez-Smith contends that defendant prison officials are restricting his right to practice his religion and that they retaliated against him by punishing him for attempting to obtain religious materials.

       I granted Hernandez-Smith leave to proceed on claims under the First and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Defendants have filed a motion for summary

---

[1] Defendants state that plaintiff is incarcerated under his legal name, Vance Smith, but I will refer to him by the name under which he filed this lawsuit. I have amended the caption to include defendants' full names as provided in their submissions.

judgment, which the parties briefed in tandem with Hernandez-Smith's motion for preliminary injunctive relief on his religion claims.[2]

For the reasons stated below, I will grant defendants' motion for summary judgment on Hernandez-Smith's constitutional claims. But I will deny defendants' motion for summary judgment on Hernandez-Smith's RLUIPA claim for declaratory and injunctive relief because they fail to establish that their complete banning of NGE materials is the least restrictive means to further their interests in security and rehabilitation. I will deny Hernandez-Smith's motion for preliminary injunctive relief. Hernandez-Smith's RLUIPA claim will proceed to a bench trial after the court recruits counsel for him.

## UNDISPUTED FACTS

The following facts are drawn from the parties' proposed findings of fact and supporting evidence and are undisputed unless otherwise noted.

### A. Parties

Hernandez-Smith is currently an inmate at Oshkosh Correctional Institution. The events forming the basis for Hernandez-Smith's claims took place when Hernandez-Smith was at Stanley Correctional Institution (SCI). Defendants Sergeant Jonathon Williams, Captain Jamison Kubala, Warden Christopher Buesgen, and Deputy Warden Mario Canziani worked

---

[2] Hernandez-Smith filed a motion for sanctions against defendants on spoliation grounds, contending that they destroyed the envelope in which the NGE materials in question were sent to him to conceal that the materials were sent directly by another United States district court. Dkt. 21. But defendants responded that they do not dispute a district court being the source of those materials, and Hernandez-Smith replied by withdrawing his motion for sanctions.

at SCI. Defendant Cindy O'Donnell was designated by the DOC secretary to review inmate grievance appeals.

## B. Nation of Gods and Earths

Hernandez-Smith considers himself to be a practicing member of a religion called the Nation of Gods and Earths (NGE), also known as the Five Percent Nation or the Five Percenters. The Department of Corrections treats the NGE as an unsanctioned security threat group, stating that the group promotes hate and Black supremacy. The DOC does not allow inmates to have any NGE written materials.

To explain the NGE belief system, defendants provide a declaration from non-defendant Cynthia Radtke, who spent several years working as a prison security threat groups coordinator. Dkt. 29. Radtke states the following:

The NGE originated in New York City in the 1960s after its leader, Clarence Smith, broke away from the Nation of Islam (NOI). The name Five Percent Nation stems from the group's belief in "Supreme Mathematics," which breaks down the population of the world into three groups: the Ten Percent, the Eighty Five Percent, and the Five Percent. The Ten Percent are those who have subjugated most of the world. They include Caucasian people and others who "create and spread the myth of a nonexistent mystery God" and who are "rich, blood suckers, and slave makers of the poor." *Id.*, ¶ 17. The Eighty Five Percent are those who are subjugated and deceived. The Five Percent are African Americans who have achieved self-knowledge. They know the African American man's true nature and that God is within the Black Man himself. NGE followers believe that the Black Man is a living, breathing God. Male members of the group are referred to as "Gods," and female members are referred to as "Earths." The teachings of the NGE are located in part in the "120 Lessons," a revised version of the

3

Supreme Wisdom Lessons of the Nation of Islam, originally written by Wallace Fard Muhammad and Elijah Muhammad. A large portion of the ideology of the NGE is similar to the NOI. For instance, both groups believe that the white man was created by an evil scientist named Yacub 6,000 years ago.

The NGE preaches that Caucasians were created using genetics of the devil, therefore all white people are inherently evil. The white man is the "Devil" and is not to be trusted. The NGE teaches that the "Original Man" is the "Asiatic Black Man," who is "the maker the owner the cream of the Planet Earth. Father of civilization and God of the Universe." *Id.*, ¶ 20. It teaches to "build a righteous nation and destroy the devil's civilization." *Id.* The "devil's civilization" is the Caucasian civilization.

Hernandez-Smith disputes portions of Radtke's description of NGE teachings. He states that NGE members do not believe all white people are evil, and that teachings about the white man being the devil or Caucasian culture being the "devil civilization" were rooted in evils visited upon Black people through the Atlantic slave trade, European colonization, and discrimination in the United States. Hernandez-Smith says that those teachings are no longer relevant and that NGE has disavowed its literature stating that the white man is the devil. When the NGE uses the term "devil civilization" or states that members are required to strive to "kill the four devils," this means that they must strive to kill lust, greed, envy, and hate. It does not mean killing white people. Hernandez-Smith says that the term "devil" is ultimately more about a person's mentality than it is about skin color; there are white members of the NGE and that evil Black people are considered "devils." The NGE renounces gang activity, and violence or other destructive activities in or out of prison are not in keeping with NGE

teachings. Instead, the NGE focuses on education, self-improvement, self-worth, and responsibility.

It is undisputed that the NGE uses numerological systems called the "Supreme Mathematics" and the "Supreme Alphabet," under which numbers or letters are assigned certain words. For instance, under the Supreme Mathematics, 1 equals "Knowledge," 2 equals "Wisdom," 3 equals "Understanding," and so on. Under the Supreme Alphabet, A equals "Allah," B equals "Be" or "Born," C equals "See," and so on. *See* Dkt. 31-1, at 1. The DOC considers these systems to be coded language. Radtke states that inmates have used these systems to create complicated coded messages that are hard for trained staff to decipher.

## C. Hernandez-Smith's request for documents and conduct report

In mid-June 2020, Hernandez-Smith requested and received a copy of the docket in *Versatile v. Johnson*, Eastern District of Virginia Case No. 09-cv-120, a case in which an NGE-practicing inmate sued Virginia prison officials over their banning of NGE materials. After receiving the docket, Hernandez-Smith requested copies of several documents from the case, including the Supreme Mathematics, the Supreme Alphabet, "Book of Knowledge," and several *The Five Percenter* newsletters. In late August 2020 the SCI mailroom received a packet of materials from the Eastern District of Virginia clerk, at least part of the NGE materials that Hernandez-Smith had requested from the *Versatile* docket.

Defendants provide several passages from those materials that they consider inflammatory and show why it is necessary to ban NGE materials. Portions of the document that defendants call the "Book of Knowledge" stated:

- "Black means dominant!" Dkt. 31-3, at 36.

- "You know the greatest strategy of our enemy (the Caucasian devil) has been to use the divide and conquer technique. Now

that we know this its time for us to do something about it."
*Id.* at 60 (parentheses in original).

- "the devil is locking us up and destroying our Warriors (Young Black Men and Women)." *Id.* at 62 (parentheses in original).

Defendants quote the following excerpts from issues of *The Five Percenter* newsletter:

- "'The white man is the devil.'" *Id.* at 68.

- "Draw it up God and let me know what you can do and how you can do it to avoid the Devil's eye." *Id.*

- "The man we heard speak that night was Malcom X. The knowledge and wisdom that the white-man is the devil was so thick in the atmosphere, we left the meeting feeling completely different about ourselves. And with a dislike for white people." *Id.* at 76.

- "I'm in the process also of getting some Gods to sign the petition to SAVE OUR SCHOOL. In this case, contact with other Gods is difficult and the devils have just passed a law saying that the inmates in NC prisons can not write to inmates at any other NC prison. They are seeking to destroy our unity so we can't build through letters and keep each other strong. I call it the beginning of the NEW WORLD ORDER." *Id.* at 90.

Because NGE is considered a security threat group, the mailroom denied delivery of those materials to Hernandez-Smith pending review. Hernandez-Smith told officials that the materials were for an open lawsuit of his, but staff reviewed records and did not find that he had any open cases. Hernandez-Smith also said that the court erroneously sent him sealed materials, but a review of the Eastern District of Virginia docket does not show that any of the documents he received had been sealed by the court. Defendant Williams issued Hernandez-Smith a conduct report for violation of Wis. Admin. Code §§ DOC 303.24 (group resistance and petitions) and DOC 303.49 (unauthorized use of mail). Williams believed that Hernandez-Smith had attempted to disguise the documents as legal work, suggesting that

Hernandez-Smith knew that he was not allowed to have NGE materials. Hernandez-Smith submitted a written statement that he wanted the documents to prepare a lawsuit aimed at overturning DOC's designation of NGE as a security threat group and that the chapel had previously denied his request for recognition of NGE as a religion.

Hernandez-Smith's disciplinary hearing was held by defendant Kubala and another non-defendant official. They found Hernandez-Smith guilty of both counts, concluding that Hernandez-Smith solicited materials that he knew were related to a security threat group. Hernandez-Smith was punished with 30 days of disciplinary separation, and the evidence was ordered to be destroyed.

Hernandez-Smith appealed his conviction. Defendant Deputy Warden Canziani reversed the decision, stating that although Hernandez-Smith had sought to bring gang-related materials into the prison as legal material, he did not think that "the CR narrative supports a finding of guilt as written." Dkt. 31-1, at 19. But Canziani agreed that the NGE materials were contraband, so he ordered those documents sent out of the prison or destroyed.

Hernandez-Smith followed with an inmate grievance that he was punished for exercising his First Amendment rights by trying to obtain materials from a court. The institution complaint examiner rejected the grievance as moot because his conviction had already been overturned. Hernandez-Smith asked for review of that rejection, stating that his complaint was about the violation of his First Amendment rights and not just his conviction, and that he was not seeking a remedy from the grievance system but rather was exhausting his administrative remedies. Defendant Canziani upheld the rejection.

Smith filed a second inmate grievance, stating that confiscation of his materials violated his First Amendment right to practice his religion. The institution complaint examiner

recommended dismissing the grievance because *The Five Percenter* newsletter explicitly stated "WE ARE NOT A RELIGION," *see, e.g.*, Dkt. 31-3, at 66, and because security threat group experts had determined that the material was contraband. Defendant Buesgen dismissed the grievance. Hernandez-Smith appealed. The corrections complaint examiner recommended dismissing the appeal because security threat group experts had determined that the documents were gang-related materials. Defendant O'Donnell dismissed the appeal.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Hernandez-Smith brings claims under several theories:

- First Amendment free exercise claims against defendants for by confiscating NGE materials, punishing him for seeking those materials, and denying his grievances aimed at getting the materials back.

- A RLUIPA claim for defendants barring him possession of NGE materials.

- A First Amendment retaliation claim against defendant Kubala for finding him guilty on disciplinary charges in retaliation for his attempt to obtain religious materials.

- A procedural due process claim against defendant Williams for confiscating his religious materials.

## A.  Free exercise claims

Prison officials may place restrictions on prisoners' free-exercise rights that are reasonably related to a legitimate penological interest. *See, e.g.*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019). Defendants move for summary judgment on Hernandez-Smith's free exercise claims for damages both on the merits and under the doctrine of qualified immunity. I need not directly address the merits

of Hernandez-Smith's claims because I conclude that defendants are entitled to qualified immunity.

The doctrine of qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Hernandez-Smith bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).

Hernandez-Smith contends that there is a clearly established right to require DOC officials to conduct "individualized assessments" of each piece of NGE material rather than blanket banning them as related to a security threat group, citing *Thornburgh v. Abbott*, 490 U.S. 401 (1989), Eighth Circuit cases including *Murphy v. Missouri Dep't of Corr.*, 814 F.2d 1252, 1256 (8th Cir. 1987) (prison officials violated First Amendment by completely banning materials from prisoner's religious group officials believed to be white-supremacist), and DOC regulations on review of incoming mail, *see* Wis. Admin. Code § DOC 309.04.

These authorities do not clearly establish that the First Amendment forbids DOC officials from banning NGE materials. In *Thornburgh*, the Supreme Court concluded that publications coming into prisons may be confiscated by prison officials after properly applying the reasonableness standard found in *Turner v. Safley*, 482 U.S. 78, 98 (1987). *Thornburgh*, 490 U.S. at 414. Although the *Thornburgh* Court did state that "we are comforted by the individualized nature of the determinations required by the regulation" at issue in that case, *id.* at 416, it did not explicitly bar blanket bans on materials from organizations considered security threats.

Hernandez-Smith cites Eighth Circuit cases that come much closer to establishing that prison officials in that circuit may not apply a blanket ban on materials from a group that prison officials deem disruptive to security, but those cases are not controlling authority for this court. Other courts have upheld bans on all NGE material, including the United States District Court for the Eastern District of Wisconsin, showing that the issue is not beyond debate. *Beamon v. Pollard*, No. 15-CV-560, 2017 WL 401218, at *9 (E.D. Wis. Jan. 30, 2017) ("All four *Turner* factors support a finding that the restriction on possessing NGE–related material is reasonably related to legitimate penological interests."), *aff'd*, 711 F. App'x 794 (7th Cir. 2018); see also *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *2 (6th Cir. May 5, 2010) ("[A] ban on written material related to [NGE] is reasonably related to the legitimate penological goal of preventing violence and maintaining security."); *Holley v. Johnson*, No. 7:08-CV-00629, 2010 WL 2640328, at *4 (W.D. Va. June 30, 2010) (rejecting argument that prison officials should ban only NGE material that specifically advocates violence).

As for Hernandez-Smith's argument that defendants' actions violated the DOC's mail-review rules, "[o]fficials sued for constitutional violations do not lose their qualified immunity

10

merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

Because Hernandez-Smith does not have a clearly established right to have prison officials conduct individual assessments on incoming publications, defendants are entitled to qualified immunity on Hernandez-Smith's individual-capacity free exercise claims for damages.

## B. RLUIPA claim

Because Hernandez-Smith alleged that that he faces a continued inability to practice his religion because of prison rules barring possession of NGE publications, I also granted Hernandez-Smith leave to proceed on a claim for injunctive and declaratory relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA).[3] Unlike his free exercise claims for damages, qualified immunity does not apply to these claims for prospective relief. *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012).

RLUIPA prohibits prisons receiving federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a)(1)–(2). In applying this statute, courts have placed the initial burden on the plaintiff to show that he has a sincere religious belief and that his religious exercise was substantially burdened. *Holt v. Hobbs*, 574 U.S. 352, 361–362 (2015); *Koger v. Bryan*, 523 F.3d 789, 797–98 (7th Cir. 2008). RLUIPA affords some

---

[3] In *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020), the Supreme Court held that plaintiffs may recover money damages for individual-capacity suits under the Religious Freedom Restoration Act (RFRA), a statute similar to RLUIPA. This ruling suggests that RLUIPA plaintiffs might also be able to bring individual-capacity damages claims. But Hernandez-Smith has not amended his complaint to include individual-capacity RLUIPA claims nor has he sought reconsideration of the court's order screening his complaint. And in any event, RLUIPA claims for damages would have the same qualified immunity problem as his First Amendment free exercise claims.

deference to officials in prison operations: "in applying RLUIPA's statutory standard, courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *See Holt*, 574 U.S. at 369. But the RLUIPA standard is "exceptionally demanding" on the government: "Congress enacted RLUIPA . . . to provide very broad protection for religious liberty." *Id.* at 356, 364.

Despite noting that issues of *The Five Percenter* newsletter explicitly state, "WE ARE NOT A RELIGION," defendants concede for purposes of summary judgment that NGE teachings are a religion and that Hernandez-Smith's religious practice was substantially burdened by defendants' actions in prohibiting NGE materials.

The burden then shifts to the defendants to demonstrate that their actions further a compelling governmental interest by the least restrictive means. *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). Defendants cite institutional security and rehabilitation as compelling interests. In general, security is a compelling interest. *Id.* at 725, n.1. I have previously concluded that rehabilitation is another compelling governmental interest under RLUIPA. *Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, at *6 (W.D. Wis. Aug. 15, 2017), *aff'd*, 723 F. App'x 370 (7th Cir. 2018).

The relevant action here is DOC officials' decision to ban all NGE written materials because they consider NGE to be a security threat group. Defendants do not provide evidence directly showing when or why it initially categorized NGE as a security threat group. Much of the parties' briefing focuses on how other state prison systems have regulated NGE materials. In their brief-in-chief, defendants say that this case is "no different" than *Allah v. Virginia*, 601 F. App'x 201 (4th Cir. 2015), a case in which the court of appeals affirmed a district court ruling finding that NGE is a gang and that the Virginia prison system's ban on NGE objects

and most NGE publications was the least restrictive means of furthering a compelling interest in prison safety. But the Wisconsin DOC's regulations here are more restrictive than those in *Allah*: they appear to include a *complete* ban on NGE publications, including all issues of *The Five Percenter* newsletter, whereas in *Allah*, Virginia officials "generally reviewed [the newsletter] on an issue-by-issue basis." *Id.* at 204. And Hernandez-Smith points to another case in which a district court concluded that the New York prison system's complete ban on NGE materials violated RLUIPA. *Marria v. Broaddus*, No. 97 CIV.8297 NRB, 2003 WL 21782633, at *7 (S.D.N.Y. July 31, 2003).

Defendants reply that *Marria* is an older case and that the Wisconsin prison system should not be forced to allow NGE materials just because the defendants in *Marria* failed to meet their burden under RLUIPA in that trial. They note that the Eastern District of Wisconsin has more recently upheld a band on NGE materials. *Beamon*, No. 15-CV-560, 2017 WL 401218. But New York is not the only state allowing NGE inmates to have the types of materials that Hernandez-Smith seeks here. My own research indicates that states are split on how to treat the NGE. For instance, in *Coward v. Robinson*, 276 F. Supp. 3d 544, 563–64 (E.D. Va. 2017), the Virginia prison system conducted a non-comprehensive survey of state policies regarding the NGE: thirteen state prison systems did not recognize the NGE as a religion, but 15 state prison systems did, with "most states that have recognized the NGE [allowing] adherents to have access to their foundational texts, including the 120 Degrees, the Supreme Mathematics, and the Supreme Alphabets," as well as permitting observance of NGE "honor days" and group worship and recognizing NGE dietary restrictions. In *Coward*, the district court ultimately concluded that the Virginia DOC had violated the plaintiff's rights under RLUIPA

and the First Amendment and the court ordered the state to remove the NGE from security-threat-group status and recognize it as a religion. *Id.* at 575.

Moreover, defendants' citation to *Beamon* from the Eastern District of Wisconsin is not particularly helpful to them regarding Hernandez-Smith's RLUIPA claim. That case (about NGE restrictions at Waupun Correctional Institution) was limited to First Amendment claims and did not include claims under RLUIPA's more plaintiff-friendly standard. And my own research shows that Beamon brought a companion lawsuit (about NGE restrictions at Redgranite Correctional Institution), also limited to First Amendment claims, in which the Eastern District court suggested that DOC's blanket ban on NGE materials might not withstand RLUIPA:

> The Court notes that were it to examine the defendants' justifications for NGE bans under a more rigorous standard than [the] *Turner* [First Amendment standard], the outcome here may likely have been different. The Court has doubts whether the defendants' few cited incidents of NGE violence that occurred over twenty years ago in other parts of the country should justify a blanket ban on NGE materials in Wisconsin prisons. However, the Court is constrained to give deference to the opinions of prison administrators as to how best operate their facilities.

*Beamon v. Dittmann*, No. 14-CV-136-JPS, 2016 WL 4916809, at *12 n.7 (E.D. Wis. Sept. 14, 2016), *vacated in part on other grounds*, 720 F. App'x 772 (7th Cir. 2017).

Although I am not bound by any of those other decisions, those cases and evidence of other states' practices allowing some amount of NGE material in prisons suggests that a complete ban is not the least restrictive means available to the Wisconsin DOC. I could still uphold the DOC's ban on NGE materials if the evidence in the summary judgment record here warranted doing so. But defendants have not sufficiently developed a record here to support

such a ruling, particularly given Hernandez-Smith's insistence that NGE has disavowed violence and old teachings that could be construed as threatening.

In support of their briefing, defendants submit declarations from Cynthia Radtke and Rebecca Blodgett, both former security threat group coordinators at DOC prisons. Radtke states that the DOC considers the NGE to be a security threat group in part "based upon the organization's propensity for violence," Dkt. 29, ¶ 15, and both Radtke and Blodgett state that the NGE poses a safety risk because of teachings that DOC considers to be Black supremacist. They also argue that the Supreme Mathematics and Supreme Alphabet could be used to create coded messages that could threaten the security of the prison.

Defendants don't adequately support Radtke's and Blodgett's conclusions that NGE adherents have a propensity for violence—they don't provide evidence discussing historical violence within the organization, nor do they provide evidence more specifically about disciplinary or safety issues among NGE adherents in Wisconsin prisons beyond vaguely stating that NGE teachings "have increased violence and disruption" in Wisconsin prisons. And Hernandez-Smith denies that NGE condones violence.

Defendants contend that NGE has historically taught Black supremacy, but Hernandez-Smith states that NGE members have disavowed literature stating that the white man is the devil. In their reply, defendants cite *Marria*, stating that the 120 Lessons "includes the teaching that the white man is 'the devil.'" But defendants do not provide a copy of the 120 Lessons, so I am unable to consider that statement in the context of the entire publication—nor do defendants grapple with the fact that the *Marria* court ultimately allowed NGE inmates to possess the 120 Lessons despite that statement. *See* 2004 WL 1724984, at *1. Defendants also provide several quotations, including references to white people being the devil, from the

15

materials that Hernandez-Smith had tried to obtain from an Eastern District of Virginia docket. A couple of those quotes, including a reference to the "Caucasian devil" come from a document labeled "Book of Knowledge" and others come from issues of *The Five Percenter* newsletter. Those isolated statements do not cover all of the publications that Hernandez-Smith thinks should be made available to him and they aren't enough to show that NGE adherents are dangerous. *See, e.g., Coward*, 276 F. Supp. 3d at 571 ("reliance on isolated statements from Nation texts to characterize the Nation as a violent group is no more justified than relying on Psalm 137 to conclude that the Bible promotes infanticide"). This is particularly so given Hernandez-Smith's testimony that NGE has disavowed violence and its earlier teachings against white people.

DOC's ban on the Supreme Alphabet and Supreme Mathematics is perhaps the most facially reasonable part of the DOC's restrictions because prison officials have clear reasons to forbid inmates from communicating in code. Coded communications could conceal escape plans, gang communications, or other potentially dangerous messages. But even despite the deference that I must afford prison officials for making decisions bearing on prison order and security, defendants must still make a plausible connection between these interests and the restriction at issue. It is clear that the Supreme Alphabet and Supreme Mathematics could be thought of as codes in the sense that they assign number or letter values to individual words. Radtke states in her declaration that inmates have used these systems "to create complicated coded messages that are hard for trained staff to decipher" and that it is difficult to assess the appropriateness of NGE materials because they "frequently include[] content written in code." Dkt. 29, at ¶¶ 21, 25. But defendants do not provide any examples of such communications, so it is difficult to assess the true danger these systems pose. In *Coward*, the court concluded

that "there is no credible evidence that either the Supreme Mathematics or the Supreme Alphabets can be used to send coded messages that would incite disorder" because "[t]hese materials have remained unchanged since the 1960s, and are widely available to law enforcement on the Internet and elsewhere." *Coward v. Robinson*, 276 F. Supp. at 572 (internal quotations omitted). And regardless, it is not clear that a complete ban on the materials is the least restrictive way to approach these materials. *See Marria*, 2004 WL 1724984, at *3 (allowing NGE members to possess Supreme Alphabet and Supreme Mathematics for personal study, but barring display of those systems).

Given the exceptionally demanding standard that RLUIPA places on governments, defendants have failed to show that their categorization of NGE as a security threat group and its accompanying complete ban on NGE publications are the least restrictive means available to them to further their interest in security and rehabilitation. There remain disputed issues of fact and gaps in the record concerning NGE's teachings, the contents of the NGE materials that Hernandez-Smith believes are necessary to practice his religion, and the feasibility of less restrictive measures. So I will deny defendants' motion for summary judgment on Hernandez-Smith's RLUIPA claim, and that claim will proceed to trial.

Hernandez-Smith has been transferred out of SCI and is now incarcerated at Oshkosh Correctional Institution. But because the DOC's restrictions at issue appear to apply to all DOC facilities, his claim for injunctive relief is not moot. I will add DOC Secretary Kevin A. Carr to the caption as the defendant on this claim.

## C.  Retaliation claim

Hernandez-Smith contends that defendant Kubala found him guilty on his disciplinary charge in retaliation for his attempt to obtain religious materials. To establish a First

Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the plaintiff makes this showing, the burden shifts to defendants to show that they would have taken the same action even without the retaliatory motive. *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). In considering a retaliation claim, the court must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (internal quotations and citations omitted); *see also Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (citing *Babcock*).

I will assume for purposes of this opinion that Hernandez-Smith was engaging in First Amendment-protected activity. Defendants suggest that no one would be deterred by the conduct report because Hernandez-Smith's conviction was reversed on appeal. But his NGE materials were still confiscated from him, so it is likely that a person of ordinary firmness would be deterred from seeking those materials in the future because such attempts would be futile.

Nonetheless, Hernandez-Smith's retaliation claim fails because Kubala had a legitimate reason for punishing him. *See Turner v. Boughton*, No. 17-cv-203-jdp, 2021 WL 1200597, at *17 (W.D. Wis. Mar. 30, 2021) (retaliation claim failed where prison officials believed letters were coded gang communications). The undisputed evidence shows that Kubala considered the evidence raised in the disciplinary proceedings and that his stated rationale for disciplining Hernandez-Smith was NGE's status as a security threat group. It is also undisputed that NGE is categorized as a security threat group in DOC prisons, and Hernandez-Smith does not

present any evidence suggesting that Kubala's stated rationale was a pretext for punishing him for preparing a lawsuit.

Moreover, even if Kubala was ultimately wrong about the true purpose of Hernandez-Smith's attempts to obtain NGE materials, defendants do not violate the Constitution merely by making errors in disciplinary proceedings. *Id.*; *see also Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272, (2016) (adverse act because of "mistaken belief" does not violate First Amendment). Hernandez-Smith continues to argue that the NGE is incorrectly considered a security threat group, but he does not produce any evidence to show that Kubala was insincere in concluding that Hernandez-Smith obtained materials that the DOC forbids. Because the only reasonable inference from the evidence is that Kubala had a legitimate reason to find Hernandez-Smith guilty, I will grant defendants' motion for summary judgment on his retaliation claim.

**D. Due process claim**

Hernandez-Smith also contends that defendant Williams denied him his due process rights by confiscating his religious materials. A procedural due process violation occurs under the Fourteenth Amendment when a state actor deprives an individual of a constitutionally protected interest in "life, liberty, or property" without providing adequate process. Therefore, "[t]o state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law." *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943–44 (7th Cir. 2010).

I granted Hernandez-Smith leave to proceed on a due process claim because unlike in many cases, the deprivation here appeared to be made under a prison policy and was thus not "random and unauthorized." *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015). But I will grant defendants' motion for summary judgment on this claim because the undisputed evidence here shows that the confiscation was appropriate under prison security threat group rules and that Hernandez-Smith received all the process that he was due. Prisoners do not have property interests in contraband. *See Anderson v. Fiedler*, 798 F. Supp. 544, 549 (E.D. Wis. 1992) ("prison inmate 'cannot seriously argue' that he has a protected property interest in contraband destroyed as such by prison officials" (quoting *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984))). It is undisputed that the materials here were indeed considered contraband because of NGE's designation as a security threat group.

But even if there were a closer question about the material's relationship to the NGE, the only process that was required was that Hernandez-Smith had a chance to challenge the confiscation of the materials, which he was able to do both in his disciplinary proceedings and though inmate grievance procedures. *See Munson v. Gaetz*, 673 F.3d 630, 638 (7th Cir. 2012) (prisoner "received all the process he was due in the form of a written notice explaining why he couldn't possess the books and a meaningful chance to be heard by a series of prison officials."). So defendants are entitled to summary judgment on Hernandez-Smith's due process claim.

**E.  Preliminary injunctive relief**

Hernandez-Smith filed a motion for preliminary injunctive relief, Dkt. 17, which the court had briefed at the same time as defendants' motion for summary judgment. Hernandez-Smith asks the court to enjoin DOC from designating the NGE as a security threat group, and

to order DOC to lift its blanket ban on NGE materials—and instead review NGE materials on an individualized basis—and give him the specific materials that were confiscated in the events leading up to this lawsuit.

To obtain a preliminary injunction, a plaintiff must show that: (1) he will suffer irreparable harm without the relief; (2) traditional legal remedies would be inadequate; and (3) he has some likelihood of prevailing on the merits of its claims. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). A stronger likelihood of success on the merits means that a lesser showing of irreparable harm may be sufficient. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Also, I must assess the requested relief under the requirements of the Prison Litigation Reform Act (PLRA), which requires that preliminary injunctive relief be narrowly drawn to correct only the harm at issue and to be no more intrusive than necessary. 18 U.S.C. § 3626(a)(2).

Hernandez-Smith has made an initial showing that he is being blocked from practicing his religion, that traditional remedies won't fix the problem, and that he has some likelihood of success on his RLUIPA claim. But the balancing of harms here works against Hernandez-Smith, particularly given the deference that I must afford to prison officials to maintain order in the facilities they run, and the potentially grave security interests at stake. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Hernandez-Smith hasn't made that showing here.

Without a more comprehensive record to be adduced at trial, I cannot say that Hernandez-Smith's likelihood of success is so great that it would be appropriate to force DOC to strike the NGE from the security threat group list and start making individualized assessments of NGE materials. So I will deny Hernandez-Smith's motion for preliminary injunctive relief.

CONCLUSION

The only claim that survives summary judgment is Hernandez-Smith's RLUIPA claim about DOC's blanket ban on NGE materials because of its listing as a security threat group. Because the only claim remaining is for equitable relief, Hernandez-Smith has no right to a jury trial. *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 966 (7th Cir. 2004). The case will proceed to a court trial.

In other RLUIPA litigation, the court of appeals has suggested that the district court "seriously consider recruiting counsel to assist [the plaintiff]" because "resolving his claims may require evidence that a prisoner will find it hard to obtain and present." *Schlemm v. Wall*, 784 F.3d 362, 366 (7th Cir. 2015). Given that NGE materials continue to be banned in Wisconsin prisons, that likely holds true for this case. For that reason and because the resolution of Hernandez-Smith's claim could have implications for other prisoners and for prison policies, it is appropriate to attempt to recruit counsel for Hernandez-Smith.

If I find counsel willing to represent Hernandez-Smith, I will advise the parties of that fact. Soon thereafter, a status conference will be held to set a new schedule. Hernandez-Smith should know that because of the large number of requests for counsel that the court receives, the search for counsel may take several months, and there is no guarantee that the court will be able to find counsel willing to represent him.

ORDER

IT IS ORDERED that:

1. Plaintiff Vance Hernandez-Smith's motion for sanctions, Dkt. 21, is WITHDRAWN.

2. Defendants' motion for summary judgment, Dkt. 26, is GRANTED with respect to plaintiff's individual-capacity free exercise, retaliation, and due process claims for damages. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim under the Religious Land Use and Institutionalized Persons Act.

3. Kevin A. Carr is added to the caption as the defendant for plaintiff's RLUIPA claim. The remaining defendants are DISMISSED.

4. Plaintiff's motion for preliminary injunctive relief, Dkt. 17, is DENIED.

5. The case is STAYED pending recruitment of counsel to assist plaintiff.

Entered August 31, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

23