IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VANCE HERNANDEZ-SMITH,

                Plaintiff,

v.

JARED HOY,[1]

                Defendant.

OPINION and ORDER

20-cv-1117-jdp

---

      Plaintiff Vance Hernandez-Smith, without counsel, is a prisoner at Green Bay Correctional Institution. Hernandez-Smith alleged that Wisconsin Department of Corrections staff barred him from possessing materials related to a group called the Nation of Gods and Earths (NGE), also known as the Five Percent Nation or the Five Percenters. This order concerns Hernandez-Smith's claim about an NGE document that the DOC continues to bar him from possessing. I will direct the state to give Hernandez-Smith this document.

      I denied the state's motion for summary judgment on Hernandez-Smith's Religious Land Use and Institutionalized Persons Act (RLUIPA) claim because the DOC failed to establish that its complete banning of NGE materials was the least restrictive means to further its interests in security and rehabilitation. Dkt. 61. Rather than proceed to trial, the state reconsidered its policy, explaining that NGE would no longer be considered a security threat group and that the blanket ban on NGE materials has been ended. I granted the state's motion to dismiss Hernandez-Smith's RLUIPA claim as moot, in all but one respect. The DOC continued to withhold a two-page document called "The Speech" by Willie Lynch; the DOC

---

[1] I have amended the caption to replace former DOC Secretary Kevin A. Carr with Deputy Secretary Jared Hoy.

has submitted that document *in camera*. Dkt. 89. The document purports to be a speech delivered by a white slaveowner in 1712 about how to control slaves by exploiting differences among them and pitting them against each other. The state copied the court on a letter counsel sent to Hernandez-Smith denying him a copy of the "The Speech," stating:

> The DAI Security Chief states that these two pages have historically been denied because they could affect the climate of the institution and can be used to rally groups of inmates to resist the authority of staff. In addition, the denied material does not appear to be related to Five Percenter / NGE teachings.

Dkt. 78.

I directed the parties to submit further briefing on this issue. Dkt. 79.[2] Hernandez-Smith responded that "The Speech" is an "essential tool in the exercise of [his] religion" and a "tool for 'self growth.'" Dkt. 86, at 1. He submits a declaration in which he states that NGE teaches "traumatic DNA transference," a theory under which "severe traumatic experiences of a person or people as a [whole], can be inherited by the off spring." Dkt. 87, at 1. I take Hernandez-Smith to be saying that this includes the trauma inflicted by slaveowners' "divide and conquer" tactics discussed in "The Speech." Hernandez-Smith states that "the way to cure [the transferred trauma] is first, to acknowledge it, then confront it." *Id.* at 2.

The state appears to concede that possession of "The Speech" is part of Hernandez-Smith's sincere religious beliefs. But the state contends both that barring inmates from possessing "The Speech" doesn't impose a substantial burden on Hernandez-Smith's religious exercise and that withholding it is the least restrictive means of furthering a compelling governmental interest in security in the prison.

---

[2] Hernandez-Smith seeks to file what he calls a supplemental reply. Dkt. 90. I will grant that motion and consider his supplemental brief, Dkt. 91.

Regarding the substantial-burden prong of the RLUIPA analysis, the state argues that "Hernandez-Smith's own declaration shows he has a wealth of knowledge accessible for use in his own self-growth and he does not actually require the document itself. Moreover, it is undisputed that Hernandez-Smith has been permitted hundreds of other pages of documents . . . ." Dkt. 88, at 3. But Hernandez-Smith's filings do not state that he "does not actually require the document"; rather, he states that it is "essential." And although an argument that a prisoner has other avenues to practice his religion might have been a persuasive argument before the Supreme Court's decision in *Holt v. Hobbs*, 574 U.S. 352 (2015), it isn't persuasive after *Holt*. As I have previously stated in a RLUIPA case, "Just to be clear about where [the *Holt* decision] leaves the substantial burden analysis: any prohibition of requested religious property will constitute a substantial burden on a religious exercise, thus placing the burden on the prison to justify that prohibition." *Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, *6 (W.D. Wis. Aug. 15, 2017), *aff'd*, 723 F. App'x 370 (7th Cir. 2018). The state doesn't cite any post-*Holt* caselaw suggesting that it can withstand a RLUIPA challenge by restricting only a limited number of the publications that a plaintiff deems essential.

As for whether the state's withholding of "The Speech" is the least restrictive means of furthering compelling governmental interests, the state cites institutional security as a compelling interest, which it ordinarily is. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). But it is not enough to invoke security in general terms; the state has the burden of showing that this interest is served by the blanket ban on "The Speech" and that denying Hernandez-Smith an exception to the blanket ban on that document is the least restrictive means of furthering that interest. *Holt*, 574 U.S. at 363; *Tanksley,* No. 15-cv-126-jdp, 2017 WL 3503377, at *6.

The state cites the declaration of Division of Adult Institutions Security Chief Robert Miller, who stated the following about the reasons for banning "The Speech":

> It is my understanding that when this document was originally banned by DOC, the inmates had been referring to the institutions as a plantation and were saying that DOC was controlling the inmates like slaves on a plantation. The document is about how to control slaves and use them on a plantation. This type of communication affects institution climate and can be used to rally groups of inmates to resist the authority of staff. It advocates distrust for authority, illegality, and pits demographics against each other.

Dkt. 86-1, at 1. I am required to give some amount of deference to Miller's rationale, although it is difficult to square that concept with the Supreme Court's description of the least-restrictive-means test as an "exceptionally demanding" standard; I have previously concluded that "[the state's] decisions are entitled to respect but not unquestioning deference." *Tanksley*, No. 15-cv-126-jdp, 2017 WL 3503377, at *7.

Despite the limited deference I must give Miller's opinion, his declaration doesn't demonstrate that banning "The Speech" serves a genuine security interest. "The Speech" doesn't specifically advocate for upheaval or encourage disrespect of prison officials. It purports to be about how to control slaves. There's good reason to doubt whether this is an accurate recounting of a 1712 speech by an actual slaveowner,[3] but regardless, white slaveowners' subjugation and mistreatment of Black slaves is a matter of historical fact and presumably not

---

[3] William Jelani Cobb, *Is Willie Lynch's Letter Real?—May 2004*, https://jimcrowmuseum.ferris.edu/question/2004/may.htm ("There are many problems with this document—not the least of which is the fact that it is absolutely fake."); Mike Adams, *In Search of 'Willie' Lynch*, Balt. Sun, Feb. 22, 1998, at 1F, 1998 WLNR 1127431 ("Over the years, [researcher Anne Taylor has] come to the conclusion that the speech is not authentic—a view shared by most of the historians she's discussed it with.").

a topic that is otherwise barred from the DOC's prison libraries. Nor is it a particularly novel insight to compare modern-day prisons to slave-era plantations.

"The Speech" itself does not discuss modern-day America; commentary from an unidentified author before and after the speech does. *See* Dkt. 89 ("Read carefully the following speech and think about what is happening in America"; "There is also an attitude of superiority that white America seems to have generation after generation that cannot be a matter of chance."). Miller doesn't explain whether it's the speech itself, the commentary before and after the speech, or simply the cachet that Willie Lynch and "The Speech" has developed over the years that he considers as the threat to prison security. And it's not even clear whether this version of "The Speech" is the same as other versions previously banned by the DOC. *See Turner v. Pollard*, No. 11-cv-708-bbc, 2013 WL 12094875, *4 (W.D. Wis. May 14, 2013) (discussing various passages, including repeated racial slurs, that do not appear in the two-page document submitted by the state here). But the bottom line is that nothing in the version of "The Speech" provided by the state here can reasonably be read to incite violence or disruption in the prison system. Nor is it more extreme than the NGE materials previously submitted in this case that the state now allows Hernandez-Smith to possess. *See* Dkt. 31-3, at 60, 62 ("You know the greatest strategy of our enemy (the Caucasian devil) has been to use the divide and conquer technique. Now that we know this its time for us to do something about it. . . . the devil is locking us up and destroying our Warriors (Young Black Men and Women)." (parentheses in original)).

The state also argues that this court has previously rejected a prisoner's claim about "[t]his same document." Dkt. 88, at 3 (citing *Turner*, No. 11-cv-708-bbc, 2013 WL 12094875, at *7). But that was a First Amendment case with a decidedly less plaintiff-friendly standard,

under which the court "must accord substantial deference to the professional judgment of prison administrators." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Prison officials cannot be afforded that amount of deference under RLUIPA. Also, the context of *Turner* was one in which NGE was still banned as a violent Black supremacist group. That is no longer the case: the state has rescinded that ban as part of this litigation. And in any event it is unclear how similar the documents in *Turner* and this case truly are. So the state can't rely on *Turner* to meet its burden under RLUIPA.

Given the exceptionally demanding standard that RLUIPA places on prison officials, the state fails to show that a complete ban on "the Speech" actually furthers its interest in security. And there aren't any genuine issues of material fact left to try. Therefore, I will deny the state's motion for summary judgment on Hernandez-Smith's RLUIPA claim as it pertains to "the Speech" and instead direct entry of judgment in Hernandez-Smith's favor.

Under 18 U.S.C. § 3626(a)(1), I may grant prospective relief to Hernandez-Smith only after finding "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." Those standards are met here with a permanent injunction directing prison officials to give Hernandez Smith the copy of "The Speech" that it has denied him.

ORDER

IT IS ORDERED that:

1. The clerk of court is directed to amend the caption as reflected in this opinion.

2. Plaintiff Vance Hernandez-Smith's motion to file a supplemental brief, Dkt. 90, is GRANTED.

3. Defendant's motion for summary judgment, Dkt. 26, is DENIED with respect to plaintiff's RLUIPA claim regarding "The Speech."

4. Summary judgment is entered in plaintiff's favor on his RLUIPA claim regarding "The Speech."

5. The court enters the following permanent injunction: defendant shall give plaintiff a copy of "The Speech" that it had previously confiscated, *see* Dkt. 89.

6. The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 25, 2024.

                              BY THE COURT:

                              /s/

                              _____
                              JAMES D. PETERSON
                              District Judge